JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Appellant, Donald T. Walker (Walker), appeals the judgment of the Cuyahoga County Court of Common Pleas that found him guilty of two counts of felonious assault, one count of drug trafficking, and one count of drug possession. After a review of the record and for the reasons set forth below, we affirm.
 {¶ 2} The events that gave rise to the charges against Walker occurred on June 13, 2006 and June 20, 2006. The evening of June 13, 2006, Billy Ramsey (Ramsey) was the victim of a shooting. That afternoon, he and his girlfriend, Tamika (last name unknown), were visiting another girlfriend of his, known as "Mirror," in her upstairs unit of a house on Parkview Avenue, in the city of Cleveland, Ohio. Tamika and Mirror were smoking marijuana laced with crack cocaine, known on the street as "primo." Ramsey was smoking a cigarette which had been dipped in phencyclidine (PCP).
 {¶ 3} Ramsey heard a car horn beeping. The women remained inside, while Ramsey went outside. While outside, Ramsey saw a man in a car that was parked in the driveway near the door of Mirror's house. Ramsey identified the man as Walker, who was known in the neighborhood as "Suman."
 {¶ 4} Ramsey, high on PCP, approached the car from the passenger side and, through the partially open passenger window, told Walker that he "couldn't be pulling in the driveway like that" and that he had to "pull out" and leave. Ramsey told Walker to leave because both he and Walker were "messing with Mirror" at the same time. Additionally, Ramsey, being from the East 102 Street neighborhood, testified he did not particularly care for Walker *Page 4 
because he viewed him as a competitor from a rival East 99 Street neighborhood. Ramsey then grabbed a pack of cigarettes from Walker's car and threw them. Walker then left, and Ramsey went back inside the house.
 {¶ 5} Mirror had been expecting Walker and was upset with Ramsey's behavior. Soon thereafter, Mirror received a phone call. After hanging up, she told Ramsey and Tamika that they had to leave and found them a ride. Ramsey went to several locations and eventually ended up walking alone near East 102 Street and Manor Avenue by Woodhill Park.
 {¶ 6} Upon reaching East 102 Street, Ramsey began walking down the middle of the street. After passing Manor Avenue, Walker approached Ramsey from behind, in the middle of the street, and shot him as he turned around. Four shots hit Ramsey in the groin, abdomen, leg, and arm.
 {¶ 7} Cleveland Police Officer Matthew Slatkovsky (Officer Slatkovsky), in a one-man car, was the first officer to arrive at the scene of the shooting. He arrived at the same time as the Emergency Medical Services (EMS), around 9:40 p.m. He was unable to understand Ramsey, who was prostrate on the sidewalk and bleeding. Blood was also observed on the sidewalk next to Ramsey, and more blood was found in the street at East 102 Street and Manor Avenue. Officer Slatkovsky also observed a black hat with a New York Yankees logo in the middle of the street on Manor Avenue, just west of East 102 Street.
 {¶ 8} Cleveland Police Officer Richard Rusnak (Officer Rusnak) and his partner Officer Sech were dispatched to the area of East 102 Street and Manor Avenue on a report of shots fired and a man down. Officer Rusnak observed EMS working on Ramsey and also *Page 5 
viewed the splatters of blood and the baseball cap in the street. Officer Rusnak recovered the baseball cap in the street as evidence.
 {¶ 9} Cleveland Police Detective Joseph Daugenti (Detective Daugenti) was assigned the case on June 14, 2006. His first solid lead came from Monique Jones (Jones) on June 20, 2006.
 {¶ 10} Jones, who knew both Ramsey and Walker from their respective neighborhoods, was driving home from class at a beauty college on the evening of June 13, 2006, at approximately 10:30 p.m. She stopped at East 93 Street and Dickens Avenue to give her mother and her mother's friend a ride. Her mother told her that Ramsey had been shot. Out of curiosity, she drove to Manor Avenue. From behind yellow crime scene tape, she saw the black Yankee baseball hat in the street.
 {¶ 11} After seeing the baseball cap and hearing on the streets that Walker shot Ramsey, Jones called Walker. She was nervous because on May 15, 2006, she sold Walker a 2000 Oldsmobile Alero (Alero), which was still titled in her name, and she did not want to be associated with the shooting. The terms of the sale were that Walker would assume her payments of $416 a month and upon completion of the required payments she would transfer the car title to him. He had only paid her $200 for the half month of May 2006. When she asked him about the status of the car payment, he responded he was "laying low," would call her back, and he hung up.
 {¶ 12} Jones called Walker repeatedly and left him messages, threatening to call the police if he did not return the Alero. He eventually called her back and told her to meet him at *Page 6 
East 99 Street and Dickens Avenue. At this meeting, Walker told Jones he needed a few days to get her the payment. She told him she wanted the car back because everyone on the street was saying that he had shot Ramsey. Walker told her not to worry because "that shit didn't happen in [her] car."
 {¶ 13} Cynthia Jones (Cynthia), Monique Jones' aunt, called Walker on her niece's behalf regarding the Alero, and he came to her house. They talked about the car and then discussed the shooting. Walker told Cynthia that she should talk to Mirror if she wanted to know what happened. He also admitted to her that he had tried to kill Ramsey.
 {¶ 14} On June 20, 2006, a week after the shooting, Jones went to the Fourth District police station and spoke to Detective Daugenti. She told him that Walker had her car. She also told him that she heard that Walker was the person who had shot Ramsey. After his discussion with Jones, Detective Daugenti made the car a suspect vehicle and named Walker a suspect. Later that evening, within an hour of the radio broadcast about the car and Walker, Detective Daugenti was informed that Walker had been detained at the VIP Bar, located at East 93 Street and Mt. Auburn Avenue.
 {¶ 15} Upon his arrival at the VIP Bar, Detective Daugenti observed the Alero parked on the street and Walker in a police car. Detective Daugenti read Walker his Miranda rights and spoke with him. Walker told him that he was at the scene of the shooting, but that Kenny Bearden (Bearden) did the shooting. Walker was arrested and questioned further regarding the shooting. The Alero was in the process of being towed to a police impound lot. The car *Page 7 
was locked, but by using a flashlight Detective Daugenti was able to see a red pouch sticking out from the under the driver's seat.
 {¶ 16} Two days later on June 22, 2006, Detective Daugenti, by using a key that was given to him by Jones, unlocked the car and pulled out the red pouch from under the driver's seat. Inside the red pouch was crack cocaine, a scale, and clear plastic baggies. He explained that the amount and manner in which the crack was packaged was consistent with drug trafficking.
 {¶ 17} Detective Daugenti proceeded to the city jail where he spoke with Walker. Walker gave a written statement in which he admitted there had been an altercation between him and Ramsey at Mirror's house. He also admitted being present on foot at the scene of the shooting at which he lost his Yankees hat while running away. He maintained that Bearden shot Ramsey. Walker admitted that the red pouch containing drugs and the scale found in the Alero belonged to him. He was released from custody at that time.
 {¶ 18} On July 13, 2006, Detective Daugenti finally was able to speak with Ramsey because by that time he had his breathing tube removed. From his hospital bed, Ramsey identified Walker from a photo array as the man who shot him. A warrant was issued for Walker's arrest. Ramsey again identified Walker as the shooter at trial. Detective Daugenti also identified Walker at trial.
 {¶ 19} On October 17, 2006, Detective Daugenti was advised that Walker had turned himself in at the Fourth District police station. Detective Daugenti met with Walker that day, who stated he was ready to talk. Detective Daugenti again read Walker his Miranda rights *Page 8 
and took a second statement from him. In this second statement, Walker admitted to shooting Ramsey. He stated that he shot Ramsey four times.
 {¶ 20} Walker stated that he drove the Alero, owned by Jones, and parked it between Dickens and Hillgirt Avenues. He then ran up behind Ramsey and shot him. Walker stated that, in addition to throwing his cigarettes earlier that day at Mirror's house, Ramsey had robbed him of crack cocaine and had intimidated him. He stated he did not want to kill him, but just wanted to scare him by shooting him in the legs. He further stated that someone gave him a ride from the crime scene in a green Oldsmobile.
 {¶ 21} The State's witness, Russell Edelheit, a DNA expert, testified that Walker's DNA was present in the band of the baseball cap recovered at the scene. Another State's witness, Nicole Pride, a scientific examiner who analyzes drugs for the Cleveland Police Department, testified that the off-white, rock-like substance tested positive for crack cocaine and weighed 24.05 grams.
 {¶ 22} On November 28, 2006, a Cuyahoga County grand jury returned a five-count indictment against Walker as follows: count one, attempted murder, in violation of R.C. 2923.02, with one-and three-year firearm specifications; count two, felonious assault, in violation of R.C. 2903.11, alleging Walker knowingly caused serious physical harm to Billy Ramsey, with one-and three-year firearm specifications; count three felonious assault, in violation of R.C. 2903.11, alleging Walker knowingly caused or attempted to cause physical harm to Billy Ramsey by means of a deadly weapon or dangerous ordnance, to wit, a firearm, *Page 9 
with one-and three-year firearm specifications; count four, drug trafficking, in violation of R.C. 2925.03; and count five, drug possession, in violation of R.C. 2925.11.
 {¶ 23} The case proceeded to jury trial on April 24, 2007. On April 30, 2007, the jury found Walker guilty on the two counts of felonious assault, felonies of the second degree, and their accompanying one-and three-year firearm specifications; guilty on the drug trafficking, a felony of the second degree, given the jury's finding that the amount of the crack cocaine exceeded 10 grams but was less than 25 grams; and guilty on the drug possession, a felony of the second degree, given the jury's finding as to the amount of the drug. Walker was found not guilty of attempted murder with the attached one-and three-year firearm specifications.
 {¶ 24} On May 4, 2007, the trial court sentenced appellant to an aggregate sentence of sixteen years. The court merged the two felonious assault counts and their accompanying firearm specifications and sentenced Walker to eight years on the underlying offense and three years on the firearm specifications, to be served prior to and consecutive with the felonious assault, for a total of eleven years. The court further imposed a five-year prison term on counts four and five, drug trafficking and drug possession, which were to run concurrent to one another and consecutive to all other counts, for a total sentence of sixteen years. Five years of mandatory postrelease control was also ordered. Walker received a two-year license suspension for the drug violations.
 {¶ 25} Walker timely appealed his convictions and submits three assignments of error for our review.
ASSIGNMENT OF ERROR ONE *Page 10 "THE TRIAL COURT ABUSED ITS DISCRETION IN IMPOSING CONSECUTIVE SENTENCES FOR THE FELONIOUS ASSAULT (W/FIREARM SPECIFICATIONS) AND POSSESSION OF DRUGS/DRUG TRAFFICKING."
 {¶ 26} Walker's first assignment of error challenges the imposition of his sentence. He argues that he should have received minimum terms for each conviction and that terms of the merged felonious assault counts and the terms on counts four and five dealing with separate violations of the state drug law, ordered to be served concurrently by the trial court, should have been ordered to run concurrently and not consecutively to the felonious assaults counts. He specifically argues that in formulating its sentence the trial court improperly utilized "sentencing packaging" prohibited by the Ohio Supreme Court's decision in State v. Saxon, 109 Ohio St.3d 176, 2006-Ohio-1245.
 {¶ 27} Walker focuses on the following statement by the trial court at sentencing when making his argument that the court "tipped its hat" and abused its discretion in using the drug charges to add five years for what the trial court found to be an abhorrent form of the offense of felonious assault.
 "THE COURT:
 Again because of the nature of the crime, the seriousness of it, a minimum term would demean the seriousness of the offense and not adequately protect the public, and the Court does find that even though it's not required to so find that the defendant certainly exhibited the worst form of the offense of felonious assault with firing four shots into another human being, so the Court is going to impose a prison term with respect to Count 2 and the Court is merging Counts 2 and 3 with respect to sentencing but will impose a prison a sentence with respect to those two counts of eight years on the underlying offense and will impose a three-year sentence with respect to the firearm specification. Those two specifications also merge *Page 11 for the purposes of sentencing and the three-year firearm specification or sentence will run prior to and consecutive with the sentence imposed for the underlying offense of felonious assault. That is a total of 11 years, and with respect to the charge of drug trafficking in Count 4, again we're dealing with mandatory time. The Court is going to impose a term in that case of five years and is also going to impose a similar or the same term of five years with respect to the charge of drug possession on Count 5. Those two counts, 4 and 5, will run concurrent to one another, but because the Court does find that the harm caused in this case was great or unusual, the Court is going to impose that time on counts 4 and 5 be consecutive with the time imposed with respect to Counts 2 and 3. That is a total of 16 years of incarceration with respect to the crimes committed here." (Tr. 735.)
 {¶ 28} Walker correctly argues that the Ohio Supreme Court has rejected the use of "sentence packaging" in Ohio in its decision inSaxton. However, his reliance on Saxton in the case sub judice is unfounded in light of the Ohio Supreme Court's holding in State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856, and subsequent decisions clarifying Foster: State v. Hairston, 118 Ohio St.3d 289,2008-Ohio-2338; State v. Bates, 118 Ohio St.3d 174, 2008-Ohio-1983.
 {¶ 29} Under Ohio law, judicial fact-finding is no longer required before a court imposes consecutive or maximum prison terms.Foster at paragraph seven of the syllabus. Instead, the trial court is vested with discretion to impose a prison term within the statutory range. State v. Mathis, 109 Ohio St.3d 54, 2006-Ohio-856. In exercising its discretion, the trial court must "carefully consider the statutes that apply to every felony case [including] R.C. 2929.11, which specifies the purposes of sentencing, and R.C. 2929.12, which provides guidance in considering factors relating to the seriousness of the offense and recidivism of the offender [and] * * * statutes that are specific to the case itself." Id. at ¶ 38. Therefore, post *Page 12 Foster, trial courts are still required to consider the general guidance factors in their sentencing decisions. State v. Goggans, Delaware App. No. 07-0051, 2007-Ohio-1433.
 {¶ 30} This court reviews a felony sentence de novo. R.C. 2953.08;Mathis, supra; State v. Tish, Cuyahoga App. No. 88247, 2007-Ohio-1836. Although we apply a de novo standard of review, we will not disturb the imposed sentence on appeal unless we clearly and convincingly find that the record does not support the sentence or that the sentence is contrary to law. Mathis; R.C. 2953.08(G)(2).
 {¶ 31} In Hairston, the Supreme Court overruled a challenge to an aggregate prison term resulting from the consecutive imposition of individual sentences, arguing that the aggregate of individual sentences were grossly disproportionate and constituted cruel and unusual punishment. The court upheld the individual sentences imposed by the trial court finding they were within the range of penalties authorized by the legislature. In so doing, the court advised that reviewing courts should grant substantial deference to the broad authority that legislatures possess in determining the types and limits of punishments for crimes. Id. at ¶ 14. It also instructed that "[althoughFoster eliminated judicial fact-finding, courts have not been relieved of the obligation to consider the overriding purposes of felony sentencing, the seriousness and recidivism factors, or the other relevant considerations set forth in R.C. 2929.11, R.C. 2929.12, and R.C. 2929.13." Id. at ¶ 25.
 {¶ 32} Finally, in holding that a trial court may impose a prison sentence to be served consecutively to a prison sentence imposed on the same offender by another court, the supreme court stated inBates: "the trial court now has the discretion and inherent authority to *Page 13 
determine whether a prison sentence within the statutory range shall run consecutively or concurrently." Id. at 179, citing Foster
at paragraph seven of the syllabus. "Once the legislature has defined the crime and has established the punishment that the trial court is to impose through its sentencing authority, the foregoing constitutional law principle further holds that `in the absence of statute, [stating otherwise], it is a matter solely within the discretion of the sentencing court as to whether sentences shall run consecutively or concurrently.'"Bates at 177, quoting Stewart v. Maxwell (1963), 174 Ohio St. 180, 181,187 N.E.2d 888.
 {¶ 33} In the case sub judice, the record reveals that the trial court considered
 {¶ 34} the general guidance factors in its sentencing decision as set forth in Goggans and Hairston. Given the wide discretion the legislature has given to trial courts to decide whether sentences shall run consecutively or concurrently, as recently outlined in Bates, we cannot say that the trial court was in error in imposing the concurrent prison terms for Walker's drug violation counts consecutively to the prison term imposed for the merged felonious assault counts.
ASSIGNMENT OF ERROR TWO "DONALD WALKER'S CONVICTIONS SHOULD BE REVERSED DUE TO INSUFFICIENCY OF EVIDENCE AND FAILURE OF THE STATE TO CARRY THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 35} In his second assignment of error, Walker argues that the State failed to present sufficient evidence that he committed the crimes of felonious assault, drug trafficking, and drug possession. In the same assignment, he also argues that his convictions for these *Page 14 
offenses are against the manifest weight of the evidence. Although two arguments involve different standards of review, because Walker has joined them in one assignment of error and because they involve a review of the same evidence, we discuss them together.
 {¶ 36} The standard of review for sufficiency of evidence is set forth in the seminal case of State v. Bridgeman (1978), 55 Ohio St.2d 261.
 "Pursuant to Criminal Rule 29 (A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." Id. at syllabus.
 {¶ 37} We noted in State v. Bradley, Cuyahoga App. No. 87024,2006-Ohio-4589, that "Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks (1991), 61 Ohio St.3d 259
* * *." The Supreme Court held:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Bradley at f 12.
 {¶ 38} According to State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52, the standard in reviewing a weight of the evidence challenge is a distinct legal concept both quantitatively and qualitatively different from the sufficiency standard.Thompkins further described this standard as follows:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather *Page 15 than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis in original.)
 * * * `The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. at 387. (Internal citations omitted.)
 {¶ 39} The essential elements of the felonious assault counts charged against Walker are set forth in R.C. 2903.11. The jury found him guilty of both subsections (1) and (2), and the trial court merged the two counts in sentencing as they were stated in the alternative. The felonious assault statute, R.C. 2903.11, reads as follows:
 "(A) No person, shall knowingly do either of the following:
 (1) Cause serious physical harm to another or to another's unborn;
 (2) Cause of attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."
 {¶ 40} R.C. 2925.03 sets forth the essential elements of drug trafficking and reads in pertinent part:
 "(A) No person shall knowingly do any of the following:
 (1) Sell or offer to sell a controlled substance;
 (2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance, when the offender *Page 16 knows or has reasonable cause to believe that the controlled substance is intended for sale or resale by the offender or another person."
 {¶ 41} The elements of the offense of drug possession are set forth in R.C. 2925.11, which provides:
 "(A) No person shall knowingly obtain, possess, or use a controlled substance."
 {¶ 42} In support of Walker's contention that his convictions for felonious assault should be reversed because of insufficiency of evidence and a failure of the State to meet the manifest weight of the evidence burden, he specifically argues no firearm was ever located, he was not arrested at the scene and was only identified months later. With regard to the same challenges as to the drug convictions, Walker argues that he was not the titled owner of the Alero and was not in the vehicle at the time the crack cocaine was recovered from it.
 {¶ 43} After a review of the evidence in light of the distinct legal concepts of sufficiency and manifest weight of the evidence challenges, we are compelled to overrule this assignment of error in its entirety. After viewing the evidence recited herein, in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes herein were proven beyond a reasonable doubt. Nor can we find that the jury created a manifest miscarriage of justice by finding Walker guilty of felonious assault, drug trafficking, and drug possession. *Page 17 
 {¶ 44} In fact, an examination of the record reveals an overwhelming amount of evidence as to each and every element of the offenses of which Walker was convicted. Most fatal to Walker's contentions as to this assignment of error are his own admissions to Detective Daugenti contained in his October 17, 2006 statement. In this statement, Walker admitted to shooting Ramsey four times with a .357 gun, which he dropped on Dickens Avenue immediately after the shooting. He stated that, although he arrived in the area in the 2000 Alero, he left the scene in another vehicle. The presence of the Yankee baseball cap described as belonging to him at the scene of the shooting and the DNA evidence matching Walker constituted strong circumstantial evidence of his involvement in the shooting of Ramsey.
 {¶ 45} With regard to the drug convictions, it is Walker's own admissions in his initial statement of June 22, 2006, given to Detective Daugenti that is critical evidence leading to conviction. In this statement, he admitted that he had been driving Jones' Alero for approximately one month and had only made one payment. He confessed that not only did he leave drugs under the front driver's seat of the Alero, he professed that the scale and the red pouch under the seat were also his. He clarified that there was approximately 28 grams in the pouch, as he had given the bartender at the VIP Bar the "rest of the dope."
 {¶ 46} As testified by Detective Daugenti, the red pouch, scale, and crack cocaine were found in the Alero impounded from the location, which Walker had parked outside the VIP Bar prior to being arrested on June 22, 2006. The presence of the scale, baggies, and the *Page 18 
manner in which the 24.05 grams were packaged was consistent with drug trafficking according to Detective Daugenti's testimony.
 {¶ 47} Accordingly, for the foregoing reasons, Walker's second assignment of error is overruled. ASSIGNMENT OF ERROR THREE
 "DONALD WALKER IS ENTITLED TO A PRESUMPTIVE MINIMUM SENTENCE BECAUSE A GREATER SENTENCE WOULD VIOLATE THE EX POST FACTO AND DUE PROCESS CLAUSES OF THE UNITED STATES CONSTITUTION."
 {¶ 48} Walker acknowledges that this court has previously rejected the argument presented by this assignment that the application ofFoster to his case violates his federal constitutional rights. He raises it to preserve the issue for future review. Impliedly he argues that the United States Supreme Court's decision in Blakely v. Washington (2004),542 U.S. 296, 124 S.Ct. 2531, mandates a "presumptive minimum" sentence, and that imposition of anything other than a minimum sentence violates the ex post fact and due process clauses of the United States Constitution.
 {¶ 49} In addressing this assignment, we note our recent observations in State v. Vaughan, Cuyahoga App. No. 90136, 2008-Ohio-3027. "As an intermediate appellate court, we are bound by the Foster decision and cannot overrule it or declare it unconstitutional. * * * [T]his court has previously addressed and rejected the argument that the imposition of more *Page 19 
than a minimum sentence violates the due process clause or the ex post facto clause. See State v. Mallette, Cuyahoga App. No. 87984, 2007-Ohio-715."
 {¶ 50} Accordingly, Walker's third assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 ANTHONY O. CALABRESE, JR., P.J., and MARY J. BOYLE, J., CONCUR *Page 1